## THE DETROITER.

### THE FRANK A. LOWERY.

### No. 263.

Circuit Court of Appeals, Second Circuit.

Feb. 10, 1936.

Lynch & Hagen, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for appellant.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for appellee The Frank A. Lowery.

Brown, Ely & Richards, of Buffalo, N. Y. (David S. Jackson, of Buffalo, N. Y., of counsel), for libelant.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by the owner of the M. V. Detroiter, from a decree in the admiralty holding it solely liable for damage to a grain cargo, lifted by the canal barge John J. Pershing, from Buffalo, bound for New York in tow of the motor tug Frank A. Lowery, of which the appellee Frank A. Lowery was the owner and claimant. While in the Barge Canal in the neighborhood of Sprakers, N. Y., the Pershing went ashore, stove in her bottom, and flooded the grain; this was the loss complained of. The Lowery's tow was made up in two sections, each consisting of three barges tandem, made fast close together, each section upon a hawser 300 feet long; the Pershing was the leading barge of the first section, followed by the Hollenbeck and the Craven. The Lowery insists that the Pershing took the strand because of suction from the Detroiter, which was passing too close and too fast, laden and also bound east. The Detroiter's position is that the Lowery had got her tow too far to the north and out of the channel, and that the Pershing sheered into the bank or ran aground unaffected by the Detroiter's passing. It is agreed that the Pershing, just at the moment when the Detroiter happened to be passing, did sheer to the left and push her nose into the bank to a distance of 33 feet from the shore just east of station No. 3170 on the canal. The judge decided that she had been within the channel, and that the Detroiter was moving too fast, and for this reason held her alone.

The first question is as to the position of the first section of the Lowery tow. Each of five witnesses on the tug or barges was positive that the distance between the vessel he chanced to be on and the shore of the canal was 35 feet; he was carefully asked whether he meant the shore line and he expressly declared that he did. Lowery thought that he was about that distance offshore when the Detroiter passed the tug; Gregory, who was steering the Hollenbeck by a Gillies wheel, was very definite that this was the distance, when the Detroiter passed his barge; so was Smith on the Craven. In the rear section Coutant on the first barge, and Lee on the second, said that they were 35 feet offshore when the Detroiter passed their barges. The north side of the channel is not marked by buoys, as is the south; the only guides are two red lights on the north shore, said in the briefs to be 2,000 feet apart, between which the accident happened.

The shore line curves gently to the north away from the range of these two lights until at station No. 3170, where the Pershing went ashore, it is 98 feet away. It is of critical importance whether we take the testimony of the Lowery's witnesses at its face, or whether we correct it, as Lowery and Smith corrected it when recalled upon rebuttal, so as to make the range and not the shore the place of reference for the distance given. This correction the judge accepted and his finding is of course persuasive, since he saw the witnesses. Moreover, the thing happened at night when estimates of distance, proverbially unreliable at any time, are especially illusory. Nevertheless the examination of all five of these witnesses was so expressly directed to the shore line and not to the range that we feel forced to assume that they meant what they said, for the later recantations are surely not convincing. One witness from the Detroiter also put the distance at the same figure, though it must be confessed that from where he was, he could not well have judged the tow's position. We do not of course mean that we take the exact footage seriously; indeed, it was a suspicious circumstance that all the witnesses swore alike. We shall try to show that the first section must have been about 80 feet from shore, and while that does indeed considerable violence to the testimony, it does less than to make the distance 130 feet, which we must say if the range be taken as the line of reference. It must be remembered in any case that it was substantially impossible for the bargees, whatever may be said as to Lowery, to estimate on which side of an unmarked channel line the flotilla was moving.

The Pershing drew 10 feet; the tug 9½; the two other barges of the first section probably the same, though that does not appear in the testimony. We have depth contours for the canal at stations No. 3175 and No. 3170, 500 feet apart. At the first station a depth of 10 feet is found at about 35 feet from shore and of 11 feet at about 40; at the second, 10 feet is found at 58 feet from shore and 11 feet at 80. Thus at station No. 3170 there is apparently a shoal which extends out some 40 feet into what would otherwise be a more or less uniform prism of the canal. If the Pershing was within 60 feet of the shore, she was therefore sure sooner or later to run aground head on; if she was within 80 feet, she would have less than twelve inches underfoot and according to several uncontradicted witnesses she would then be liable to "dive," that is, to take unaccountable sheers. Everybody agrees that she did sheer and that means some lateral movement. How much she turned no one can say; because though she sank at right angles to the channel, there was a current which might have moved her stern slowly while her nose alone was fast. We may, however, be certain that she did not go ashore head on, and this meant that she was more than 60 feet offshore. We have assumed that she was 80 feet off only because that at once accounts for all the facts and least wrenches the testimony; it puts her right side not far from the channel line, but her bottom over the shoal at station No. 3170. We can readily understand how she got into such a position; the tug had gone to the left to give the Detroiter a wider berth, and Gregory, at the wheel of the Hollenbeck, said that he moved over still farther; the hawser had gone slack and the section, having very little headway, was out of control for the moment. At a distance of 35 feet from shore there was usually enough water.

The Detroiter got consent to pass the tow shortly after passing a hydraulic dredge at about station No. 3205; she began to lap the rear section at station No. 3195. It is uncertain whether she was opposite the Craven or the Pershing, when the Pershing sheered; but whichever it was, her *average* speed had not been too great. If she was opposite the Craven, she had gone from station No. 3195 to a point 300 feet west of station No. 3170 or 2,200 feet, while the Craven had gone from a point 600 feet east of station No. 3195 to a point 300 feet west of station No. 3170, or 1,600 feet. As the tow's speed was about a mile, her *average* speed had been a little less than 1.40 miles. If the Detroiter was opposite the Pershing, she had gone from station No. 3195 to station No. 3170, or 2,500 feet, while the tow had gone from a point 500 feet west of station No. 3195, to station No. 3170, or 2,000 feet. Her *average* speed had been about 1.25 miles. But as the judge very wisely observed this tells us nothing of her speed when passing the first section, and Anderson, the mate in command of the Detroiter at the time, testified before the inspectors that he passed the tow at two and a half to three miles

an hour, though he attempted to recant at the trial. We think his first estimate was probably correct when he got opposite the first section, though not before. There was certainly something in the navigation of the Detroiter at that point which frightened that section just before the accident. One bargee swore that he shouted a warning; another heard the shout; and more important than this, the tug blew an alarm to the Detroiter. This we think must have been while she was passing the first section; so Lowery said, and although two of the Detroiter's crew swore that it was as she was passing the tug and after the Pershing had already gone ashore, that is most unlikely. In the first place, the danger was then past, for the damage was done; and, if it be argued that the Lowery might nevertheless have wished to tell the Detroiter of the damage, the answer is that Anderson said that he had no intimation of anything untoward till he reached New York. We conclude that the alarm was given in an effort to reduce the speed of the passing boat; and we agree with the judge that when she came about abreast of the Craven (he put it a little earlier), she started ahead, thinking she was clear.

The distance between the two vessels at passing is in dispute, like nearly everything else in the case. There seems to be no doubt that the Detroiter passed the 'rear section closer aboard than she did the first; she said that she kept within 15 or 18 feet of the marking buoys on the south side of the channel, and perhaps she did. If so, her left side was only 60 feet from the south line and there were 140 feet between her and the north line. Assuming that the Pershing was 80 feet offshore, as she was 20 feet abeam, the Detroiter gave her a berth of one hundred and forty, which might have been enough in ordinary circumstances. That is less than the berth she claims she gave, but a good deal more than the tug allows. So much assumed, the most natural explanation of the accident is what the judge found, with the single exception of the position of the tow. With him we believe that the Detroiter, seeing herself with so ample a berth, put on speed supposing she could do so safely. In so doing she drew the water away from the 'Craven, which was in effect the stern of a single vessel 300 feet long. This single vessel being in shallow wa-

ter, the effect of the suction was much exaggerated upon it; though the water was drawn down perhaps not more than 2 or 3 inches, it pressed strongly against the left side of the Craven and drew her in, pivoting the whole section on the Hollenbeck and making the Pershing sheer to the left and run aground about 35 feet from shore. We find both vessels at fault for this result: The Detroiter because although she was so far off, she hit up her speed without considering that the position of the tow made her especially vulnerable to suction; the tug, for letting the tow get out of the channel and into shallow water and thus become unduly sensitive to suction. The whole thing was due to the shoal which extends out into the canal at station No. 3170; but both masters are charged with notice of such shoals, and while the Lowery took her chances in going in so far, the Detroiter ought to have considered that the Lowery was taking those chances, and ought not to have navigated as though the tow were in the channel, certain of enough water underfoot.

Decree modified to hold each claimant at fault and liable for one-half damages.